**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

COUNTY COMMISSIONERS OF THE
COUNTY OF SIERRA, *et al.*,

      Petitioners,

v.                                      Civ. No. 21-611 GBW/CG

UNITED STATES DEPARTMENT
OF THE INTERIOR, *et al.*,

      Respondents.

## <u>ORDER GRANTING MOTION TO DISMISS</u>

THIS MATTER comes before the Court on Respondents' Motion to Dismiss and Memorandum in Support (*doc. 37*) and Petitioners' Motion to Complete or Supplement the Administrative Record or Complete Discovery (*doc. 48*). Having considered the Motions and their briefing (*see docs. 44*, *46*, *58*; *docs. 54*, *60*) and conducted a hearing on Petitioners' Motion, *see doc. 65*, and being otherwise fully advised, the Court GRANTS Respondents' Motion to Dismiss and DENIES Petitioners' Motion to Complete or Supplement the Administrative Record as MOOT.

## I. BACKGROUND

Mexican wolves, the smallest surviving subspecies of gray wolf in North America, have been listed as an endangered subspecies pursuant to the Endangered Species Act (ESA), 16 U.S.C. § 1531, *et seq.*, since 1976. *See* Determination that Two Species of Butterflies are Threatened Species and Two Species of Mammals are

Endangered Species, 41 Fed. Reg. 17736, 17738 (Apr. 28, 1976); Endangered Status for the Mexican Wolf, 80 Fed. Reg. 2488, 2488 (Jan. 16, 2015).  Mexican wolves' historic range included "portions of the southwestern United States and northern and central Mexico," but they were extirpated in the United States by the early 1970s.  Revision to the Regulations for the Nonessential Experimental Population of the Mexican Wolf, 80 Fed. Reg. 2512-01, 2514 (Jan. 16, 2015) ("Revised 10(j) Rule") (codified as 50 C.F.R. § 17.84(k)).  Recovery efforts have been ongoing in the United States and Mexico pursuant to a binational Mexican Wolf Recovery Plan since the Mexican wolf's listing as an endangered subspecies.  *Id.*

In the United States, the United States Fish and Wildlife Service (FWS) is charged with ensuring the recovery and continued survival of Mexican wolves.  *See id.* at 2512; 16 U.S.C. § 1533(d).  A primary component of FWS's Mexican wolf conservation efforts is its maintenance—in collaboration with other federal and state agencies and the White Mountain Apache Tribe—of an experimental population of Mexican wolves in the Mexican Wolf Experimental Population Area (MWEPA), which includes portions of Arizona and New Mexico.  *See* Revised 10(j) Rule, 80 Fed. Reg. at 2515.  The objective for FWS's management activities in the MWEPA is to establish a single, experimental population of 300 to 325 Mexican wolves, which will in turn serve as a stepping-stone toward FWS's ultimate goal of reestablishing the Mexican wolf across the entirety of its range.  50 C.F.R. § 17.84(k)(9)(iii); Revised 10(j) Rule, 80 Fed. Reg. at 2516-17.

FWS's current authority for its Mexican wolf conservation efforts is the Revised 10(j) Rule, codified at 50 C.F.R. § 17.84(k).  The Rule authorizes FWS to maintain a captive breeding program; undertake initial releases and translocations; and remove and take[1] Mexican wolves, among other activities.  *See* Revised 10(j) Rule, 80 Fed. Reg. at 2512-13; 50 C.F.R. § 17.84(k).  Relevant here, the Rule defines "problem wolves" as

> Mexican wolves that, for the purposes of management and control by [FWS] or its designated agent(s), are:
> (A) Individuals or members of a group or pack (including adults, yearlings, and pups greater than 4 months of age) that were involved in a depredation on lawfully present domestic animals;
> (B) Habituated to humans, human residences, or other facilities regularly occupied by humans; or
> (C) Aggressive when unprovoked towards humans.

50 C.F.R. § 17.84(k)(3).  The Rule authorizes FWS to translocate problem wolves, *see id.* § 17.84(k)(7)(vii)(C), and translocate wolves to private land within the Zones 1 and 2 of the MWEPA "in cooperation with willing private landowners, … and with the concurrence of the State game and fish agency," *see id.* § 17.84(k)(9)(i).  The Rule, though, does "not include a set of specific criteria for removal of problem wolves … in order to maximize … flexibility in effectively managing Mexican wolves."  Revised 10(j) Rule, 80 Fed. Reg. at 2530.  Instead, it provides that "[t]hese criteria will be developed in a management plan."  *Id*.

The instant case arises from FWS's decision in March 2021 to translocate two

---

[1] "Take" is a term of art meaning to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  50 C.F.R. § 17.84(k)(3) (citing 16 U.S.C. § 1532(19)).

adult Mexican Wolves (M 1693 and F 1728) and their dependent pups to the privately-owned Ladder Ranch within Zone 2 of the MWEPA in Sierra County, New Mexico.  *See doc. 1* at ¶¶ 1, 6; 50 C.F.R. § 17.84(k)(3) (defining the boundaries of Zone 2); N.M. Stat. Ann. §§ 4-27-1, 4-27-2 (defining the borders of Sierra County).  At the time of the translocation decision, M 1693 and F 1728 were "problem wolves" within the meaning of the Revised 10(j) Rule because they had been involved in multiple livestock depredations.  *See doc. 1* at ¶ 1; *doc. 37* at 9.

Petitioners include the County Commissioners of Sierra County on behalf of Sierra County, several privately-owned ranches on private property and federal land adjacent to Ladder Ranch, and William R. Lindsay, a ranch operator whose property abuts Ladder Ranch.  *Doc. 1* at ¶¶ 11-15.  They filed their Petition for Review of Final Agency Action in this Court on July 1, 2021, bringing four claims under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA), and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* (APA), based on Respondents' alleged failure to adequately analyze or notify the public of the March 2021 translocation decision.  *See id.* at ¶¶ 66-78 (claiming (i) the decision is arbitrary and capricious because FWS failed to consider the effects of translocating of a problem wolf "with aggressive behavior towards humans" to private land adjacent to land where livestock are lawfully grazed or on which there are private residences; (ii) the decision is arbitrary and capricious because FWS "failed to provide any reasoning for the decision to release problem

wolves onto private land in Sierra County"; (iii) the decision is contrary to NEPA or otherwise noncompliant with its procedural requirements because FWS failed to assess the environmental impacts of decisions to translocate problem wolves within the MWEPA; and (iv) the decision is contrary to law and noncompliant with procedure required by law because FWS failed to provide adequate public notice of the decision, as required by NEPA and FWS policy). Petitioners seek a declaratory judgment that Respondents violated NEPA, agency procedure, and the APA, a vacatur of the March 2021 translocation decision, and to "enjoin … Respondents' [sic] from releasing the problem wolves from their holding pens in Sierra County until the proper analysis and public comment period is completed."[2] *Id.* at 18.

On October 15, 2021, Respondents filed the instant Motion to Dismiss and Memorandum in Support, seeking dismissal of Petitioners' Petition for Review under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim. *See doc. 37* at 1, 4, 28. Petitioners filed a response on November 15, 2021. *Doc. 44*. The Motion was fully briefed on December 13, 2021, *see doc. 59*, with the filing of Respondents' reply, *doc. 58*.

---

[2] The wolves were placed in a temporary holding pen on Ladder Ranch on June 17, 2021, and released on July 1, 2021. *Doc. 1* at ¶ 62; *doc. 37* at 9 (citing *doc. 37-1* at ¶ 10). Petitioners include a request for preliminary relief in their Petition for Review, *see doc. 1* at 18-19, but have not moved the Court for such relief. Respondents suggest in a footnote that the wolves' release renders Petitioners' legal challenge to the translocation decision moot but have not otherwise briefed the issue on account of their contention that Petitioners lack standing. *See doc. 37* at 17 n.5. Because the Court concludes that it lacks subject matter jurisdiction over Petitioners' claims, it does not address the question of whether they are moot.

On November 19, 2021, four days after filing their response to the Motion to Dismiss, Petitioners filed their Motion to Complete or Supplement the Administrative Record or Complete Discovery.  *See doc. 48*.  Respondents filed their response on December 3, 2021.  *Doc. 54*.  The Motion was fully briefed on December 22, 2021, *doc. 61*, with the filing of Petitioners' reply, *doc. 60*.  The Court held a hearing on this Motion on January 20, 2022.  *See doc. 65*.

## II.    LEGAL STANDARDS

### A.  NEPA and the APA

NEPA aims to protect the environment through procedural means—most notably, by requiring federal agencies to analyze the environmental consequences of their proposed actions.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); 42 U.S.C. §§ 4321, 4332(C).  At NEPA's "heart" is the "requirement that federal agencies 'include in every recommendation or report on proposals for … major Federal actions significantly affecting the quality of the human environment, a detailed statement'" including, *inter alia*, "the environmental impact of the proposed action," any unavoidable adverse environmental impacts stemming from the proposed action, and "alternatives to the proposed action."  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 42 U.S.C. § 4332(2)(C)).  This requirement vindicates NEPA's twin goals of requiring agencies to "take a 'hard look' at environmental consequences" and "provide for broad dissemination of relevant environmental information."  *Methow*

*Valley*, 490 U.S. at 350; *see also Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  NEPA does not create a private right of action, so a party alleging that an agency has not complied with its procedural requirements must rely on the APA.  *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000); *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998).

The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  Petitioners bring their claims under § 706(2)(A) and (D) of the APA, *see doc. 1* at ¶¶ 76-78, which together provide that a reviewing court shall "hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law," 5 U.S.C. § 706(2).

The Tenth Circuit has instructed courts reviewing agency action under § 706(2)(A) to treat such actions as appeals, conduct their review based on the administrative record, and govern themselves by the Federal Rules of Appellate Procedure.  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). Nevertheless, petitions for review of agency action brought under § 706 may be summarily dismissed under Rule 12(b) without review of the administrative record when they fail to state a claim within a court's jurisdiction.  *Kane Cnty. v. Salazar*, 562 F.3d 1077, 1086 (10th Cir. 2009).

**B.  Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) allows a party to contest a federal court's

jurisdiction over the subject matter of a claim by motion.  Fed. R. Civ. P. 12(b)(1).  The

party invoking a federal court's jurisdiction bears the burden of establishing that

jurisdiction exists.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974);

*Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014).  "[C]onclusory

allegations of jurisdiction are insufficient."  *Harris v. PBC NBADL, LLC*, 444 F. App'x

300, 301 (10th Cir. 2011).

Rule 12(b)(1) permits two forms of attack on a complaint: facial and factual.  A

facial attack asserts that the allegations in the complaint, even if true, are insufficient to

establish subject matter jurisdiction.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.

1995).  By contrast, a factual attack on the complaint challenges the veracity of the

allegations upon which subject matter jurisdiction depends.  *Id.* at 1003.  Courts

reviewing factual attacks have "wide discretion to allow affidavits, other documents,

and a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Id.*

**C.  Rule 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint "must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face."  *Leverington v. City of Colorado Springs*, 643 F.3d 719,

723 (10th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  This standard

does not require "detailed factual allegations," but it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When ruling on a 12(b)(6) motion, the Court must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Leverington*, 643 F.3d at 723 (quoting *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). However, the Court need not accept the truth of any legal conclusions. *Iqbal*, 556 U.S. at 678.

In general, the Court is limited to the facts pled in the complaint in ruling on a motion to dismiss, *Gossert v. Barnhart*, 139 F. App'x 24, 24 (10th Cir. 2005), and the Court's consideration of facts outside the complaint requires it to treat a motion to dismiss as a motion for summary judgment, *Merswin v. Williams Cos.*, 364 F. App'x 438, 441 (10th Cir. 2010). "There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference; (ii) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (iii) matters of which a court may take judicial notice." *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1191 (D.N.M. 2013) (internal citations and quotation marks omitted).

## III.   ANALYSIS

The Court begins with Respondents' Motion to Dismiss before addressing

Petitioners' Motion to Complete or Supplement the Administrative Record.

Respondents' Motion to Dismiss challenges the Court's subject matter jurisdiction on

three grounds: (i) Petitioners' claims are not subject to judicial review under the APA;

(ii) Petitioners lack Article III standing; and (iii) Petitioners lack statutory standing

because their claims are not within the zone of interests protected by NEPA.  *See doc. 37*

at 5.  The Court determines that it lacks jurisdiction over Petitioners' claims because the

Petition for Review does not challenge agency conduct that is a "final agency action"

within the meaning of the APA.  Therefore, it does not reach Respondents' standing

arguments.

A.  <u>**Petitioners' Claims for Relief are not Reviewable under the APA**</u>

Petitioners' claims are not subject to judicial review because the Petition does not

challenge a final agency action.  Because Petitioners allege causes of action under NEPA

and the APA, *see doc. 1* at ¶ 1, and they must rely on the APA to bring their NEPA

claims, they must show that all of their claims satisfy the APA's requirements for

reviewability, *see Colo. Farm Bureau Fed'n*, 220 F.3d at 1173; *Coal. of Ariz./N.M. Cntys. for*

*Stable Econ. Growth v. U.S. Fish & Wildlife Serv.*, No. CIV 03-508 MCA/LCS, 2005 WL

8164390, at *4 (D.N.M. Jan. 31, 2005) (stating that plaintiffs "must show that [their

NEPA] claims fall within the parameters of judicial review set forth in the APA").  One

such requirement is to "identify some 'final agency action'" as the object of the

challenge.  *Catron Cnty Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434

(10th Cir. 1996) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990)); *see also Colo. Farm Bureau Fed'n*, 220 F.3d at 1173 ("[Petitioners] have the burden of identifying specific federal conduct and explaining how it is 'final agency action….'").  The finality of a challenged agency action is a legal question, *Colo. Farm Bureau Fed'n*, 220 F.3d at 1173, that is also jurisdictional in the Tenth Circuit,[3] *see Cherry v. U.S. Dep't of Agr.*, 13 F. App'x 886, 890 (10th Cir. 2001).

An agency action is final if it satisfies two conditions: (1) it "mark[s] the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted).  Each of these conditions "must be satisfied independently for [an] agency action to be final." *Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 61 (D.C. Cir. 2020). Courts take a pragmatic approach to determining whether an agency action is final, *see U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016); *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 149 (1967), and determine the finality of a particular action by considering

---

[3] Courts of Appeals have split on the question of whether a plaintiff's failure to challenge a final agency action deprives a court of jurisdiction.  *See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1190-91 (D.N.M. 2020) (discussing the circuit split).  Various Courts of Appeals have concluded that the finality of a challenged agency action only implicates whether a plaintiff has a statutory cause of action under the APA, and therefore disputes concerning finality should be resolved under Federal Rule of Civil Procedure 12(b)(6).  *See id.* at 1191 (collecting cases).  The Tenth Circuit's position, however, is that challenges to an agency action's finality implicate a court's subject matter jurisdiction.  *See id.* at 1190 (collecting cases).

it within the context of the relevant regulatory scheme as a whole, *see Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 147-48 (D.D.C. Feb. 13, 2020) ("The decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action … represents the culmination of that agency's consideration of an issue." (quoting *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018))).

Petitioners argue that they have alleged two final agency actions: (1) the March 2021 decision to release two problem wolves on private land in Sierra County, *see doc. 44* at 11; *doc. 1* at ¶¶ 1, 7, 73; and (2) the failure to provide adequate notice of that translocation to Petitioners pursuant to FWS's Standard Operating Procedure (SOP) 6, *doc. 44* at 11-14.  Because neither of these actions constitute "final agency action" within the meaning of the APA, the Court lacks jurisdiction to consider Petitioners' challenges to them.

1.   *March 2021 Translocation Decision*

FWS's March 2021 decision to translocate two problem wolves to private property is not a "final agency action."  Under the standards set forth in *Bennett v. Spear*, 520 U.S. 154 (1997), and subsequent case law, this decision neither represents the consummation of FWS's decision-making process nor is an action from which legal consequences flow.

The principle that an agency action is not final if it does not mark the

consummation of an agency's decisionmaking process and fix legal rights and

obligations bars challenges to interim decisions, *see, e.g., Gordon v. Norton*, 322 F.3d 1213,

1220 (10th Cir. 2003); *Utah Native Plant Soc'y v. U.S. Forest Serv.*, 923 F.3d 860, 873 (10th

Cir. 2019), challenges seeking improvements to agency programs broadly, *see Lujan*, 497

U.S. at 891, challenges to an agency's daily operations and implementation decisions

made pursuant to a broader agency plan, *see, e.g., Chem. Weapons Working Grp., Inc. v.

U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997); *Cherry*, 13 F. App'x at 891.  In

view of the regulatory scheme relevant here—namely, the Revised 10(j) Rule's

authorization for FWS to manage the experimental population of Mexican wolves in the

MWEPA—the Court finds that decisions to translocate problem wolves like M 1693 and

F 1728 are akin to other agency actions that courts have found to be implementation

decisions not subject to APA review.

An implementation decision is one that merely carries out a broader agency plan

that marked the consummation of the relevant decision-making process.  Therefore,

despite being the *outcome* of some decision-making process, the decision does not

represent the agency's "last word on the matter in question."  *See Whitman v. Am.

Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (discussing the APA's final action standard for

purposes of applying the "final action" standard of § 307 of the Clean Air Act).  For

example, in *Chemical Weapons Working Group, Inc. v. United States Department of the Army*,

the Tenth Circuit found that the Department of Defense's commencement of trial burns

at a chemical weapons incineration plant was not a final agency action because the

Army had already determined how it would destroy chemical weapons at that plant, as

set forth in a 1989 Final Environmental Impact Statement (FEIS) prepared seven years

prior to the plaintiffs' challenge.  *See* 111 F.3d at 1487-88, 1494.  Because the "[p]laintiffs

provide[d] no indication that the Army ha[d] ever revisited the question" of how it

would undertake its disposal operations at the plant in the years following the 1989

FEIS, the court determined that the Army's subsequent actions, including commencing

trial burns, were "the implementation of a 'final disposition' already made" in the FEIS.

*Id.* at 1494 (citing 5 U.S.C. § 551(6)).  Similarly, in *Wild Fish Conservancy v. Jewell*, 730 F.3d

791, 801 (9th Cir. 2013), the Ninth Circuit held that the individual physical acts of

closing the gates of a dam at a fish hatchery were implementation decisions rather than

final agency actions because they "constitute[d] day-to-day operations that merely

implement operational plans for the [h]atchery."  In so holding, the court acknowledged

that the act of closing dam gates had "immediate physical consequences," but it stated

that such physical consequences, standing alone, were insufficient to demonstrate an

underlying "agency action" within the meaning of the APA.  *Id.* at 801.

To summarize, even actions with novel (and perhaps impactful) physical

consequences are not subject to judicial review under the APA when they merely

implement an agency's previous disposition of a matter.  *Cf. Cherry*, 13 F. App'x at 890-

91 (finding that an agency's letter informing the occupant of a mining claim site that he

must remove his equipment was not a final agency action because the letter merely implemented preexisting decisions respecting the occupant's need to file an operating plan and did not determine the validity of the occupant's claim that he did not need an operating plan); *Montana Snowmobile Ass'n v. Wildes*, 103 F. Supp. 2d 1239, 1242 (D. Mont. 2000) (holding that a Forest Service letter stating that snowmobile use was no longer permitted in two areas of a national forest was not a final agency action because the letter implemented a previously-unenforced decision to close those areas to motorized use), *aff'd*, 26 F. App'x 762 (9th Cir. 2002).

However, not all agency decisions made pursuant to a broader agency plan are unreviewable implementation decisions. When a decision has independent legal force because it substantially changes, modifies, or imposes conditions upon an agency's previous disposition of a matter, and such changes have "clear and definite" legal consequences, the decision can no longer be viewed as "mere implementation" and should be subjected to judicial review under the APA. *See Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1330-31 (10th Cir. 2007); *cf. Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 985 (9th Cir. 2006) (finding that Annual Operating Instructions for grazing allotments were final agency decisions because they consummated the agency's decisionmaking process for managing these allotments by "put[ting] … additional modifications [and] restrictions" on the terms of grazing permits). This distinction is informed by and related to the second requirement for finality, which is that an action

fix legal rights and obligations.  An action fixes legal rights and obligations when it is "a definitive statement of an agency position; the action [has] a direct and immediate effect on the day-to-day business of the complaining party; the action [has] the status of law; immediate compliance with the terms [is] expected; and the question [is] a legal one fit for judicial resolution."  *United States v. United Nuclear Corp.*, 610 F. Supp. 527, 528 (D.N.M. 1985) (discussing *F.T.C. v. Standard Oil Co.*, 449 U.S. 232, 239–40 (1980)); *see also New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1193 (D.N.M. 2020) (listing examples of "legal consequences" that "are necessary before a court can review 'final agency action'" and collecting cases).  Indicia of whether an agency action or decision fixes legal rights and obligations include: (i) whether the agency will revisit the decision in the future, (ii) whether the agency itself characterizes the action as "final," and (iii) whether the action or decision is binding on the agency, and if so, for how long.  *See Hawkes Co.*, 578 U.S. at 598 (finding that an administrative determination during a permitting process was a final agency action because it would not be revisited without new information, it was described by the agency in its own regulations as a final agency action, it bound the federal government for five years, and during that time it created a safe harbor from enforcement proceedings for the regulated party).

In *Center for Native Ecosystems*, the Tenth Circuit considered whether Annual Operating Instructions (AOIs) issued by the Forest Service to grazing permittees to make "periodic changes and adjustments" to the terms of grazing permits were final

agency actions. *See* 509 F.3d at 1331. In concluding that AOIs were final action over the Forest Service's argument that were a "management tool," the court first noted that AOIs had "clear and definite consequences for permittees" because they were the Forest Service's final word on the distinction between "permitted" grazing and "authorized" grazing—a distinction that required permittees to adjust their day-to-day activities—and were immediately binding upon permittees without the need for additional process. *See id.* at 1329-30. The court additionally noted that AOIs could make quantitatively significant adjustments to the terms of a permittee's grazing permit—by substantially decreasing the authorized number of "animal months of grazing," for example. *See id.* at 1331 (noting that the challenged AOIs decreased the permitted number of animal months of grazing to 1,559 and 1,368, as compared to the 2,047 months authorized by the grazing permits). Given the types of changes that could be enacted through an AOI (*i.e.*, changes with practical implications of a large magnitude in addition to legal implications), the Tenth Circuit determined that AOIs involved "significant decisions by the Forest Service that constitute much more than mere implementation of grazing permits" and therefore should not be "insulate[d] from review." *Id.*

Based on the foregoing, the Court finds that the March 2021 decision to translocate M 1693 and F 1728 is an "implementation decision" made by FWS pursuant to the Revised 10(j) Rule. Like the decision to commence trial burns that was challenged

in *Chemical Weapons Working Group*, the translocation was authorized by and conducted

pursuant to a previous agency planning document: here, the Revised 10(j) Rule.

Admittedly, the 1989 FEIS in *Chemical Weapons Working Group* may be distinguished

from the Revised 10(j) Rule on the basis of how definitive it was with respect to the

manner in which the alleged final action should be undertaken.  The *Chemical Weapons*

*Working Group* court noted that the 1989 FEIS indicated "precisely" how the challenged

federal action would be undertaken, *see* 111 F.3d at 1494, while the Revised 10(j) Rule

only "explains how problem wolves will be managed in general" and provides that

additional management plans containing additional procedures will be forthcoming, *see*

80 Fed. Reg. at 2533.  Crucially, however, the Court finds no indication in the Revised

10(j) Rule that the future management plans it describes may revisit the question of

whether FWS has authority to translocate problem wolves to private land.  *See* 50 C.F.R.

§ 17.84(k)(3) (stating that future "Service- approved management plan[s]" will comply

with the Revised 10(j) Rule).  Therefore, the Court finds that the Revised 10(j) Rule

purports to be, and is, FWS's "final disposition of the matter" of whether problem

wolves may be translocated to private property.  *See Bennett*, 520 U.S. at 174.

In so finding, the Court rejects Petitioners' contention that the March 2021

translocation decision cannot be an implementation of the Revised 10(j) Rule because

the Rule "does not grant any authority to translocate '*problem wolves*' onto private

property" by "mak[ing] no mention of the possibility of translocating 'problem wolves'

onto private property" and because the Rule's Federal Register Notice and
environmental impact statement "[do not] discuss the translocation of wolves with 11
confirmed livestock depredations."  *Doc. 44* at 8-9.  Contrary to these assertions, the
Court finds that the Revised 10(j) Rule specifically authorizes translocations of problem
wolves.  *See* 50 C.F.R. § 17.84(k)(7)(vii)(C) ("The Service or designated agency may carry
out intentional or opportunistic harassment, nonlethal control measures, *translocation*,
placement in captivity, or lethal control of problem wolves." (emphasis added)).  The
Rule also provides for translocations of Mexican wolves onto private land located in
Zone 2 of the MWEPA, which contains Sierra County.  *See id.* § 17.84(k)(9)(i) ("On
private land within Zones 1 and 2 … of the MWEPA, the Service or designated agency
may develop and implement management actions to benefit Mexican wolf recovery in
cooperation with willing private landowners, including … translocation of Mexican
wolves onto such lands ….").  In tandem, these two provisions authorize FWS to
translocate problem wolves to private land in Zones 1 and 2 (subject to certain
conditions not at issue here).[4]

---

[4] As for Petitioner's contention that the Rule does not discuss the translocation of wolves with 11
confirmed livestock depredations, the Court notes that the Revised 10(j) Rule expressly discusses the
translocation of wolves with confirmed livestock depredations.  *See* 50 C.F.R. § 17.84(k)(3) (defining a
problem wolf as an individual involved "in a depredation on lawfully present domestic animals" such as
"livestock … and non-feral dogs"); *id.* § 17.84(k)(7)(vii)(C) (authorizing FWS to translocate problem
wolves).  Admittingly, the Rule does not distinguish between a problem wolf with a single depredation
and one with multiple depredations.  It does, however, contemplate that a problem wolf may be involved
in more than one depredation.  *See id.* § 17.84(k)(7)(vii)(C)(1) (considering, to determine the presence of
problem wolves, "[e]vidence of wounded domestic animal(s) or remains of domestic animal(s)); Revised
10(j) Rule, 80 Fed. Reg. at 2545 (characterizing the Rule as containing several provisions "by which a
domestic animal or livestock owner can take … a Mexican wolf in response to depredations").  Having

19

Additionally, the decision to translocate M 1693 and F 1728 does not fix legal rights and obligations. Unlike the AOIs in *Center for Native Ecosystems*, the translocation decision did not substantially change, modify, or impose conditions on FWS's previous decision to authorize the translocation of problem wolves to private land as one of its management tools in the MWEPA. Nor did it otherwise carry any clear and direct legal consequences for FWS or Petitioners. The challenged decision specifically—and decisions to translocate wolves pursuant to the Revised 10(j) Rule generally—are viewed by the FWS as "management actions" for advancing the FWS's goal of Mexican wolf conservation, *see* 50 C.F.R. § 17.84(k)(9)(i), as opposed to "definitive statement[s] of an agency position," *cf. Hawkes Co.*, 578 U.S. at 598 (holding that an agency jurisdictional determination was a final action in part because the agency described it as such). Indeed, the Revised 10(j) Rule makes translocation decisions concerning problem wolves and wolf translocations to private land discretionary. *See* 50 C.F.R. § 17.84(k)(7)(vii)(C) (stating that "[t]he Service … *may* carry out … translocation … of problem wolves") (emphasis added); *id.* § 17.84(k)(9)(i) (stating that "[o]n private land within Zones 1 and 2, … the Service … *may* develop and implement management actions … including initial release and translocation" (emphasis added)). Even upon

_____

concluded that the Revised 10(j) Rule authorizes the March 2021 translocation decision, the Court expresses no further opinion on Petitioners' attacks on the adequacy of its discussion and analysis of translocating problem wolves with multiple depredations, as they are not before the Court and are time-barred. *See Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245 & n.2 (10th Cir. 2012) (stating that APA claims generally are covered by the limitations period in 28 U.S.C. § 2401 and must be brought within six years of when a plaintiff is put on inquiry notice of the existence of a claim).

the initiation or completion of a translocation, that translocation decision does not bind

the FWS insofar as the flexible management approach prescribed by the Rule authorizes

FWS to subsequently remove problem wolves or take other necessary actions.  *See*

Revised 10(j) Rule, 80 Fed. Reg. at 2530 (stating that "[FWS] did not include a set of

specific criteria for removal of problem wolves in this final rule in order to maximize

[its] flexibility in effectively managing Mexican wolves"); *id.* at 2533 (stating that a

forthcoming management plan would "discuss flexible thresholds for removal of

problem Mexican wolves"); *cf. Hawkes Co.*, 578 U.S. at 598 (finding that an

administrative determination was a final agency action because it bound the agency for

five years and "represent[ed] the Government's position in any subsequent Federal

action or litigation concerning that final determination").  Finally, individual

translocation decisions do not alter the legal regime governing FWS's Mexican wolf

conservation efforts.  *Cf. Bennett*, 520 U.S. at 177-78 (finding that a Biological Opinion

determined legal rights or obligations and carried legal consequences because it "altered

the legal regime to which the action agency is subject" by authorizing an agency to take

an endangered species if it complied with specified conditions).

The March 2021 translocation decision also carries no direct and clear legal

consequences for Petitioners.  It does not suspend or impose any regulatory

requirements with which they must comply or otherwise impose additional obligations

upon them.  *Cf. Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020) ( "[A]n

agency's suspension of regulatory requirements ordinarily affects regulated parties' rights or obligations" (cleaned up)); *Sackett v. EPA*, 566 U.S. 120, 126 (2012) (stating that legal consequences flowed from an agency order in part because it required the plaintiffs to restore their property according to an EPA-approved work plan and give the EPA access to the property and to various records).  Nor does it expose Petitioners to any civil or criminal penalties.  *Cf. Sackett*, 566 U.S. at 126 (noting that the challenged order exposed the plaintiffs to double penalties in a future enforcement proceedings); *Hawkes Co.*, 578 U.S. at 600 (explaining that the challenged action provide a five-year safe harbor from liability); *Or. Nat. Desert Ass'n*, 465 F.3d at 987-88 (finding AOIs final, in part, because a permittee's failure to comply with their terms could result in administrative sanctions).  In short, the need for additional decision-making before any singular translocation is carried out does not render a wolf translocation decision a final agency action because such procedures do not bring about any legal consequences for Petitioners or FWS, contrary to Petitioners' arguments otherwise.[5]  *See doc. 44* at 11; *cf.*

---

[5] Petitioners' argument concerning the legal consequences that flowed from the March 2021 translocation decision is limited to their statement that those legal consequences are the same as those that demonstrate their standing.  *See doc. 44* at 11.  The Court has parsed Petitioners' standing arguments and found that they can be fairly read to include the following alleged consequences stemming from the decision to translocate M 1693 and F 1728: (i) Petitioners' "uneas[e] and … fear that it is only a matter of time until … wolves move onto their ranches to eat or harass [Petitioners'] livestock," *id.* at 16-17; (ii) Petitioners' concerns regarding human safety due to the presence of wolves near their property, *id.*; (iii) Petitioner Sierra County's procedural harm of not being afforded the opportunity to participate as a cooperating agency in the challenged translocation decision, *id.* at 17; (iv) Petitioners' concerns about impacts on local wildlife, *id.* at 17; and (v) Petitioners' procedural harm of not being given an opportunity to participate in public notice and comment on the decision to translocate M 1693 and F 1728 before it was concluded, *id.* at 20-21.  Petitioners cite no authority in support of their arguments that Sierra County has a procedural right to be included as a cooperating agency, *see doc. 44* at 17, and that Petitioners have a procedural right

*Center for Native Ecosystems*, 509 F.3d at 1330-31.

Finally, the Court's conclusion that wolf translocation decisions in the MWEPA are not final agency actions is consistent with the underlying purpose for the APA's limitations on judicial review.  As the Supreme Court articulated in *Norton v. Southern Utah Wilderness Alliance*, that purpose is to "protect agencies from undue judicial interference with their lawful discretion" by precluding courts from being "empowered to enter general orders compelling compliance with broad statutory mandates [or] determin[ing] whether compliance [with broad statutory mandates] was achieved."  542 U.S. 55, 66-67 (2004) (*SUWA*).  The March 2021 translocation decision, like other translocation decisions made by FWS pursuant to the Revised 10(j) Rule, is just one of many actions FWS may take to implement its plan for maintaining the experimental population of Mexican wolves in the MWEPA.  In addition to managing a captive breeding program, releasing and translocating wolves, and removing or taking wolves, FWS also engages in Mexican wolf identification, tracking, "monitoring, researching, and evaluating the status of Mexican wolves and their offspring," and "continu[ing] to modify subsequent management actions depending on what is learned," among other actions.  *See* Revised 10(j) Rule, 80 Fed. Reg. at 2525-26.  The Revised 10(j) Rule provides

---

to submit comments on decision to translocate M 1693 and F 1728, *see id.* at 17, 21-22; *U.S. v. Hardwell*, 80 F.3d 1471, 1492 (10th Cir. 1996) (stating that failure to "make any argument or cite any authority to support [an] assertion" waives an issue raised in passing).  As for Petitioners' other alleged injuries, these alleged consequences are unlike the types of legal consequences that courts have previously found to indicate that a challenged action is a final agency action within the meaning of the APA.  *See supra pp.* 21-22.

for flexibility and the implementation of "adaptive management principles" in FWS's

management of the experimental population.  *See, e.g., id.* at 2525, 2548.  Given the

iterative process for managing the experimental population set forth by the Rule, the

variety of management actions it authorizes, and the numerosity of the translocations

that have occurred to date,[6] the Court cannot find that each wolf translocation decision

is an independently reviewable final agency action without contravening the limitations

on APA review meant to prevent courts from "inject[ing] themselves 'into day-to-day

agency management.'"  *Coal. of Ariz./N. M. Cntys. for Stable Econ. Growth*, 2005 WL

8164390, at *5-6 (quoting *SUWA*, 542 U.S. at 66-67) (finding that FWS's "ongoing, day-to-

day process of implementing recovery plans or reintroduction programs [is] not the

type of action[] which can be subjected to judicial review").  Indeed, in the context of

previous APA claims challenging FWS's management activities pursuant to the 1998

10(j) Rule, this Court has held that enabling APA challenges to particular FWS decisions

about whether to kill or capture individual problem wolves or groups of wolves would

"render the agency's decision-making process intractable to the point of absurdity."  *Id.*

at *21.

## 2. *Failure to provide adequate public notice*

Petitioners also argue that they have challenged a second final agency action:

---

[6] According to the Federal Register notice for the Revised 10(j) Rule, which provides the most recent figures of which the Court is aware, there were 197 initial releases and translocations of Mexican wolves between 1998 and 2013.  Revised 10(j) Rule, 80 Fed. Reg. at 2516.

FWS's alleged failure to follow Standard Operating Procedure (SOP) 6.  *See doc. 44* at 14

("FWS's failure to notify Petitioners as required by SOP 6 'constitutes agency action

subject to judicial review [because] the agency failed to perform a legally required, non-

discretionary duty.'" (quoting *Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1099

(D. Ariz. 2009))); *see generally doc. 44* at 11-14.  Petitioners assert that SOP 6 constitutes a

policy of "notify[ing] local permittees (those within a 10-mile radius of a translocation

site), local county officials, local District Rangers and a livestock industry contact of a

proposed translocation of Mexican wolves," *id.* at 12-13 (quoting *doc. 37-9* at 2), and that

FWS violated this policy because its May 3, 2021, letter sent to various members of the

public discussing the proposed translocation of M 1693 and F 1728 "did not inform the

public of the specific incidents of aggressive behavior toward a human and repeated

confirmed livestock depredation," *doc. 1* at ¶ 72.  Petitioners also contend that FWS

violated this policy because "at least one landowner who fit … Respondents' criteria for

receiving the notification received no notification at all."  *Id.* at ¶ 2.

　　To the extent the Petition for Review can be read to bring a separate challenge to

the public notice provided by FWS in connection with the March 2021 translocation

decision—as opposed to challenging the March 2021 translocation decision on the

grounds that it did not comply with SOP 6—the Court notes that it does so under §

706(2) of the APA, rather than under § 706(1).  *See generally doc. 1.*  Section 706(2) "allows

courts to set aside agency action," while § 706(1) "allows courts to compel agency

action." *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1197 (D.N.M. 2015); 5 U.S.C. § 706(1), (2).  Petitioners' arguments in their response to the instant Motion to Dismiss, though, implicate § 706(1), *see doc. 44* at 11, 14 (citing *Defenders of Wildlife*, 607 F. Supp. 2d at 1099); *doc. 44* at 13 (arguing that "FWS is obligated to follow [SOP 6]"), and upon review of such arguments, the Court finds that any separate claim based on FWS's alleged failure to follow notification procedures should be brought under § 706(1), *see Jarita Mesa*, 140 F. Supp. 3d at 1197 ("The only way to 'set aside' a failure to act is to compel agency action, … which is the relief that § 706(1) provides."(citing *SUWA*, 542 U.S. at 61-62)).  Therefore, although the Petition for Review does not identify § 706(1) as the legal basis for a separate claim based on FWS's allegedly deficient notice process, for the sake of judicial economy the Court will analyze Petitioners' arguments concerning SOP 6 under § 706(1).

Under § 706(1), the Court will "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take."  *SUWA*, 542 U.S. at 64.  This limitation on review "protect[s] agencies from undue judicial interference with their lawful discretion."  *Utah Native Plant Soc'y*, 923 F.3d at 874 (quoting *id.* at 64, 66).

Although Petitioners' response to the instant Motion to Dismiss identifies SOP 6 as the source of the mandatory duty with which they allege FWS failed to comply, *see*

*doc. 44* at 11-14, the Court finds no allegations in the Petition for Review supporting

Petitioners' legal conclusion that SOP 6 is legally binding on FWS.  Instead, the Petition

only makes generalized allegations concerning FWS's alleged violations of, alternately,

"agency requirements and policy," "law and policy," "FWS policy and procedure," *doc.*

*1* at ¶ 2, "FWS policy," *id.* at ¶ 72, and "agency procedure," *id.* at 18, based on its failure

to notify, or in the alternative, to provide adequate notice, to "all landowners within a

ten (10) mile radius of the release site" of the March 2021 translocation decision, *id.* at ¶

72.  Therefore, the allegations in the Petition for Review do not sufficiently identify a

discrete and mandatory agency duty for purposes of stating a claim under § 706(1),

because although Petitioners plead facts supporting the inference that FWS failed to

take a discrete action, Petitioners do not plead any facts that would permit the Court to

infer that FWS was required to take that discrete action.  *See Ouachita Watch League v.*

*Henry*, 59 F. Supp. 3d 922, 930 (E.D. Ark. 2014) (stating that "to state a claim under §

706(1), a plaintiff must allege facts allowing the Court to infer reasonably that an agency

failed to take discrete agency action that it is required to take"); *Butanda v. Wolf*, 516 F.

Supp. 3d 1243, 1247 (D. Colo. 2021) ("Section 706(1)'s 'limitation to required agency

action rules out judicial direction of even discrete agency action that is not demanded by

law.'" (quoting *SUWA*, 542 U.S. at 64)).  The Court finds that this failure is sufficient to

justify dismissal of the "notice" claim.

    In the alternative, even if the Court were satisfied that the Petition for Review

sufficiently alleges the existence of a discrete and mandatory agency duty,[7] it

nevertheless finds that Petitioners fail to state a claim under § 706(1) based on FWS's

alleged failure to act.  SOP 6 is not enforceable against FWS either because it is not in

effect or, if it remains in effect, because it does not impose a nondiscretionary duty on

FWS.[8]

The parties do not dispute that SOP 6 was drafted in connection with the 1998

Rule rather than the 2015 Revised 10(j) Rule, but do dispute whether SOP 6 remains in

effect following the 2015 update to the Mexican wolf 10(j) rule.  *See doc. 44* at 12-14; *doc.*

*54* at 11 (citing *doc. 54-1* at 1).  Notably, the Federal Register Notice for the Revised 10(j)

Rule indicates that new standard operating procedures would be promulgated pursuant

to the 2015 Mexican wolf 10(j) rule:

> Immediately following publication of this final rule, the Service will begin
> working with partner agencies on an interagency management plan that
> will include standard operating procedures for management of Mexican
> wolves ….  This process of following a Mexican wolf 10(j) rule with an
> interagency management plan that includes standard operating
> procedures was done with the 1998 rule and the 1998 Interagency

---

[7] This alternative finding also addresses the possibility of Petitioners seeking to amend the Complaint to specifically allege that SOP 6 was the source of the agency duty.

[8] Although the Court generally must restrict its review to the allegations within the four corners of the Complaint (here, the Petition for Review) and presume the veracity of such allegations in its analysis under Rule 12(b)(1), the Court may review SOP 6 at this juncture.  When a party challenges the facts upon which a court's jurisdiction depends, "a district court may not presume the truthfulness of [the disputed] allegations" and instead "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1156 (D.N.M. 2015) (quoting *Hill v. Vanderbilt Cap. Advisors, LLC*, 834 F.Supp.2d 1228, 1241 (D.N.M. 2011), and *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981)).  Respondents' attack on Petitioners' allegation that SOP 6 is legally binding on the FWS raises a jurisdictional issue that is not intertwined with the merits of Petitioner's claims, so the Court may refer to SOP 6 without resolving the instant Motion under Rule 56 standards.  *See id.* at 1157.

Management Plan.

Revised 10(j) Rule, 80 Fed. Reg. at 2533.  This published notice strongly suggests that the

standard operating procedures applicable to the updated rule would only be those

promulgated subsequent to the publication of the updated rule.  While it is conceivable

that old procedures could be carried over to the implementation of the updated rule,

Petitioners cite to no authority for such continuation.[9]  The only evidence Petitioners

present to support the continued force of SOP 6 after the promulgation of the 2015

Revised Rule 10(j) is an email from the Mexican Wolf Recovery Coordinator that

generally states "[i]t has long been our standard operating procedure … to notify local

permittees [and] local county officials … of a proposed translocation of Mexican

wolves."  *See doc. 37-9* at 2.  This statement hardly compels the conclusion that the

particulars of SOP 6 were still in force.  Moreover, the fact that an agency has followed a

procedure in the past does not convert that procedure into a mandatory duty.  *Cf. Ctr.*

*for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 23 (D.D.C. 2017) (stating that "absent a

preexisting legislative (or otherwise legally binding) duty to complete a task, an agency

does not spawn such a duty simply by commencing the task").  Petitioners have not

satisfied their burden to establish that SOP 6 was in effect when the alleged failure to

notify occurred.  Consequently, the "notice" claim is subject to dismissal for failure to

---

[9] In fact, SOP 6 itself had "supersede[d] relevant sections of the 1998 Mexican Wolf Interagency
Management Plan" and partially represented the "Service Approved Management Plan" referenced in the
1998 Rule.  *Doc. 58* at 11 n.4; *doc. 45-1* at 23.

state a claim.

In the alternative, assuming SOP 6 remained in effect following the promulgation of the Revised 10(j) Rule, it does not impose a mandatory duty upon FWS.  As this Court has previously recognized, "Supreme Court case law establishes that internal policy statements are not legally binding and therefore not judicially enforceable against [an agency]." *Jarita Mesa*, 140 F. Supp. 3d at 1199 (citing *Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981)).  "It is axiomatic that an agency must adhere to its own regulations, and that it need not adhere to mere 'general statement[s] of policy." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (citations omitted); *see also Ctr. for Biological Diversity*, 260 F. Supp. 3d at 21 (stating that origin of an agency's mandatory duty "need not be a statute—it can also be an 'agency regulation that has the force of law'" (quoting *SUWA*, 542 U.S. at 64)).  Nonetheless, "[m]anual provisions and internal agency guidelines for implementing statutes are generally not binding on agencies." *Or. Nat. Res. Council v. Devlin*, 776 F. Supp. 1440, 1447 (D. Or. 1991).

Whether an agency pronouncement is judicially enforceable turns on (1) whether it prescribes substantive rules rather than "interpretive rules, general statements of policy or rules of agency organization, procedure or practice" and (2) whether it was "promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress." *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982); *see Jarita Mesa*, 140 F. Supp. 3d at

1200 (quoting *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071 (9th Cir. 2010));

*S. Ute Indian Tribe v. Amoco Prod. Co.*, 119 F.3d 816, 832 & n.23 (10th Cir. 1997) (stating

that legislative rules, which bind an agency, may be distinguished from general

statements of policy because they are promulgated in accordance with notice and

comment procedures and have the same binding effect as a statute on members of the

public and on courts).  In analyzing an agency document for these two requirements,

courts consider the document's practical effects, such as whether it imposes rights and

obligations or leaves the agency free to exercise its discretion, and whether the agency

has expressed an intent to be bound through its own characterization of the document

and the procedures it followed in publishing it.  *See Wilderness Soc'y v. Norton*, 434 F.3d

584, 595 (D.C. Cir. 2006).  An agency document is more likely to be found to bind an

agency if it is published in the Federal Register or the Code of Federal Regulations,

prescribes substantive rules rather than general policy statements, and was

promulgated in accordance with the APA's public notice and comment procedures.  *Id.*;

*Jarita Mesa*, 140 F. Supp. 3d at 1200-01.

It is undisputed that SOP 6 was not published in the Federal Register or

published in accordance with the notice and comment rulemaking procedures in § 553

of the APA.  *See doc. 37* at 27; *cf. doc. 45-1* at 26 ("The Mexican Wolf Blue Range

Reintroduction Project Adaptive Management Oversight Committee approved this SOP

on November 24, 2004.").  Instead, it was adopted by an internal oversight committee.

*See id*.  SOP 6's statement that it "describes the processes for proposing and approving translocations of Mexican wolves," *see doc. 45-1* at 23, indicates that its purpose is to set forth general statements of agency policy and procedure rather than prescribe substantive rules.  While it indicates that notice "shall" be provided to certain entities and individuals, mandatory language alone does not convert an agency policy into a binding regulation, particularly when the document was not published in accordance with notice and comment rulemaking procedures under § 553 of the APA or published in the Federal Register or Code of Federal Regulations.  *See Wilderness Soc'y*, 434 F.3d at 595.  Considering the procedural nature of the requirement and the manner in which it was adopted, this Court concludes that SOP 6 did not create a mandatory duty such that it would be judicially enforceable.

The Court is unpersuaded that *Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1099 (D. Ariz. 2009) would dictate a different result even if it were binding precedent.  Petitioners argue that SOP 6 is enforceable against FWS because it "contains language nearly identical to that in SOP 13," and such language was the basis for the *Tuggle* court's finding that SOP 13 was a "final agency action" for purposes of APA review.  *See doc. 44* at 11-12.  As explained previously, Petitioners have not brought a substantive challenge to SOP 6 under § 706(2), but rather are arguing that FWS unlawfully failed to comply with SOP 6's requirements under § 706(1).  *See generally id.* at 11-14.  The issue of whether SOP 6 is a "final agency action" is not dispositive of the

question of whether it creates a discrete and mandatory legal duty for purposes of a failure to act claim under § 706(1).  *See Audubon of Kan., Inc. v. U.S. Dep't of Interior*, Case No. 2:21-cv-02025-HLT-JPO, 2021 WL 4892916, at *7, *9 (D. Kan. Oct. 20, 2021) (stating that agency inaction is only actionable under the APA if the underlying action is legally required, in addition to being a "final agency action"), *appeal docketed*, Case No. 21-3209. Therefore, regardless of whether Petitioners can show that Respondents' non-compliance with SOP 6 is a final action, their failure to plead facts permitting a reasonable inference that SOP 6 sets forth any mandatory duty for FWS precludes them from compelling FWS to comply with SOP 6 under § 706(1), and this claim must be dismissed.  *See SUWA*, 542 U.S. at 64.

### B.  Petitioners' Motion to Supplement the Administrative Record

The Court will deny Petitioners' Motion to Complete or Supplement the Administrative Record.  In it, Petitioners request the Court to compel Respondents to produce a complete administrative record for the challenged March 2021 translocation decision.[10]  *See doc. 48* at 2-3, 6.  The Motion to Complete or Supplement also references several documents that Petitioners allege Respondents must produce for purposes of the Court's disposition of Respondents' Motion to Dismiss, including the Final Environmental Impact Statement for the 10(j) Rule, the 2021 Initial Release and

---

[10] Respondents have not produced the administrative record for the challenged decision at this stage of the proceedings because they have yet to file an answer to the Petition for Review.  The parties dispute whether there is any administrative record yet in existence for the challenged decision.  *See doc. 65* at 5.

Translocation Proposal for the MWEPA, and SOP 6 and its "clarification memo." *Id.* at 4-6.  At the January 20, 2022, Motion Hearing on Petitioners' Motion to Supplement, counsel for Petitioners admitted that he believes he has full and correct copies of these documents and clarified that Petitioners' primary concern underlying the Motion to Supplement is the potential existence of undisclosed SOPs that govern FWS's wolf translocation decisions in the MWEPA.  *See doc. 65* at 4-5.  Any such documents would not alter the Court's foregoing legal analysis on the merits of Respondents' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1), because the existence of additional procedures would not convert the challenged translocation decision from an implementation decision to a final agency action.  *Cf. Wilderness Watch v. Ferebee*, 445 F. Supp. 3d 1313, 1327 (D. Colo. 2020) (denying a motion for jurisdictional discovery on the grounds that the court was not persuaded that such discovery would reveal evidence that would render the case not moot), *appeal dismissed per stipulation*, 2021 WL 2026247 (10th Cir. Feb. 4, 2021).  The Motion to Supplement is therefore denied as moot.

## IV.   CONCLUSION

For the reasons set forth above, Petitioners' Petition for Review of Final Agency Action (*doc. 1*) fails to state a claim under NEPA or the APA because it does not challenge final agency action or reviewable agency inaction.  Therefore, Respondents' Motion to Dismiss (*doc. 37*) is GRANTED under Fed. R. Civ. P. 12(b)(1) and Petitioners' claims are DISMISSED WITHOUT PREJUDICE.  Additionally, Petitioners' Motion to

Complete or Supplement the Administrative Record or Complete Discovery (*doc. 48*) is

DENIED as MOOT.

      **IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**